# AFFIDAVIT

I, William Burmeister, being duly sworn, hereby state the following:

## INTRODUCTION AND AGENT BACKGROUND

1. I have been a Special Agent with the Office of Inspector General for the Board of Governors of the Federal Reserve System (the "Board") and the Consumer Financial Protection Bureau ("CFPB") (collectively, "FRB OIG") since 2019. During my time as a Special Agent, I have investigated financial frauds involving the employees and programs of the Board and the CFPB. I have also investigated financial frauds perpetrated against Board and CFPB-regulated financial institutions. During these investigations, I have executed or participated in the execution of arrest warrants.

2. Before becoming a Special Agent, I worked as a Detective Investigator at the New York County District Attorney's Office from 2014 to 2019. During my time as a Detective Investigator, I was assigned to the Cybercrime and Identity Theft Bureau, where I investigated complex financial frauds, network intrusions, dark net investigations, narcotics trafficking, and money laundering, among other matters.

3. I submit this affidavit in support of an application for a criminal complaint charging LUIS ANTONIO REGO BAIROS-PIRELLI ("BAIROS-PIRELLI") with receipt of a bribe by a bank employee, in violation of 18 U.S.C. § 215(a)(2), and for a warrant to arrest BAIROS-PIRELLI.

4. As an FRB OIG Special Agent, I am familiar with 18 U.S.C. § 215(a)(2). That statute prohibits a financial institution employee from corruptly soliciting, demanding, accepting, or agreeing to accept anything of value from any person, intending to be influenced or rewarded in connection with the financial institution's business or transactions.

5. The facts in this affidavit come from my personal observations, review of records, my training and experience investigating financial crimes, and information obtained from other law enforcement officials and witnesses. This affidavit is merely intended to show that there is probable cause for the requested complaint and arrest warrant and does not set forth all my knowledge on this matter.

6. As set forth below, there is probable cause to believe that BAIROS-PIRELLI (a bank supervisor) solicited and accepted at least $50,000 in cash, food, and other gifts, including jewelry, from a check casher in exchange for allowing the check casher to deposit millions of dollars in suspect checks that did not clear. BAIROS-PIRELLI made many of those checks—written for tens and sometimes hundreds of thousands of dollars—available for immediate cash withdrawal by unsecure couriers, in violation of his employer's policies, and he falsified internal records to cover up the transactions.

**INFORMATION RELATED TO THE RELEVANT FINANCIAL ENTITIES**

7. Financial Institution 1 is headquartered in Middlesex County, Massachusetts. Financial Institution 1 has more than ten locations in Massachusetts. Financial Institution 1 is a Federal Reserve member bank, and the Federal Deposit Insurance Corporation insures its deposits. Therefore, Financial Institution 1 is a financial institution within the meaning of 18 U.S.C. § 20(1) and (7).

8. Financial Institution 1, like other financial institutions, is subject to strict reporting requirements that stem from the Bank Secrecy Act ("BSA"). *See* 12 U.S.C. §§ 1829b, 1951-1960 & 31 U.S.C. §§ 5311-5314, 5316-5336. Among other things, the BSA requires all financial institutions (other than casinos) to file a Currency Transaction Report ("CTR") with the Financial Crimes Enforcement Network ("FinCEN"), a U.S. Treasury Department bureau,

whenever there is a transaction in currency (*e.g.*, a deposit, withdrawal, or exchange of currency) of more than $10,000 by or through the financial institution. 31 C.F.R. § 1010.311. That requirement helps FinCEN and other law enforcement agencies detect fraud, money laundering, and other unlawful activities, because cash transactions are much more difficult to trace than other payment methods, such as bank, wire, or automated clearing house transactions.

9. To comply with the BSA, financial institutions train employees regarding when they must collect information for the purpose of filing CTRs. Although supervisors review employees' records, financial institutions rely on employees who personally assist in cash transactions to keep accurate records because those employees are ultimately the only individuals who personally witness cash transactions.

10. Because they are the only witnesses to cash transactions, financial institution employees who conduct such transactions must input the relevant transaction information into a bank system to record the transactions. At Financial Institution 1, employees input the information into Financial Institution 1's internal customer recordkeeping system. Financial institution employees who focus on BSA-related duties (the "BSA staff") use information from the internal recordkeeping system to perform their duties.

11. The Brink's Company ("Brink's") provides a secure courier service that financial institutions and other businesses often use to securely transport cash, sometimes in armored trucks. If a financial institution customer uses Brink's (or another secure courier service) for a cash transaction of $10,000 or more, the financial institution's witnessing employee and BSA staff must list Brink's as a party in internal records regarding the transaction and on the resulting CTR filing.

12. At all relevant times, Check Casher 1 was an Everett, Massachusetts-based check cashing business. Individual 1 owned 75 percent of Check Casher 1 and was Check Casher 1's only employee. Individual 1 banked at the Financial Institution 1 branch in Medford, Massachusetts (the "Medford Branch").

**PROBABLE CAUSE TO BELIEVE THAT A FEDERAL CRIME WAS COMMITTED**

13. Beginning on or about March 20, 2017, and continuing through at least on or about April 24, 2026, BAIROS-PIRELLI worked for Financial Institution 1 at the Medford Branch. On or about March 31, 2025, Financial Institution 1 promoted BAIROS-PIRELLI to the role of Assistant Manager at the Medford Branch. In that capacity, BAIROS-PIRELLI supervised other Medford Branch employees.

14. As described below, starting in or around 2023 and continuing through April 24, 2026, BAIROS-PIRELLI solicited and accepted gifts and loans from Individual 1. BAIROS-PIRELLI explicitly tied those gifts to agreeing to keep Check Casher 1 as a customer of Financial Institution 1. And, beginning in or around June 2025, BAIROS-PIRELLI processed checks that Check Casher 1 presented for deposit without placing holds on the checks (thus making funds available for immediate withdrawal) while disregarding Financial Institution 1's anti-fraud software's flags that indicated many of those checks bore signs of fraud. Indeed, between on or about February 24, 2026, and April 20, 2026, more than $28 million of Check Casher 1's checks bounced, resulting in a loss of more than $1.5 million to Financial Institution 1.

***A. BAIROS-PIRELLI understood his obligation not to accept gifts or borrow from customers***

15. According to Financial Institution 1's records, when it first hired BAIROS-PIRELLI in 2017, he received many new-hire trainings, including BSA and Anti-

Money Laundering ("AML") compliance training. Also, according to Financial Institution 1's records, in 2025 and 2026, BAIROS-PIRELLI completed other training courses relevant to his BSA, AML, and anti-fraud responsibilities, such as the courses listed below:

| **Training Title:** | **Date Completed:** |
|---|---|
| Check Fraud | 2/10/2026 |
| Fraud Prevention | 2/10/2026 |
| Insider Fraud | 2/10/2026 |
| Code of Ethics and Reg O Training | 2/10/2026 |
| BSA/AML: Recordkeeping – Wires, Money Orders and Other Challenges | 3/24/2025 |
| BSA/AML: Communicating with Customers about CTRs | 3/24/2025 |
| BSA/AML: CIP Advanced | 3/24/2025 |
| BSA/AML: Fundamentals | 3/24/2025 |

16. On March 20, 2017, BAIROS-PIRELLI's first day at Financial Institution 1, he signed a Code of Ethics certification in which he agreed to always abide by Financial Institution 1's Code of Ethics. Financial Institution 1 requires its employees to annually recertify their compliance with its Code of Ethics. On November 15, 2025, BAIROS-PIRELLI acknowledged reviewing Financial Institution 1's 2025 Code of Ethics. That code states, "Although gifts from customers generally are intended as sincere expressions of friendship and appreciation based on personal relationships that often develop in the normal course of business, accepting gifts of cash, or any items that can be converted to cash, in any amount, is prohibited." The Code of Ethics also warns that "Soliciting or accepting anything of value in connection with a business transaction may be a violation of the Federal Bank Bribery Law (Title 18 U.S. Code, Section 215), as amended by the Bank Bribery Amendment Act of 1985." Furthermore, the Code of Ethics provides that "Borrowing from an individual or business customer of the Bank must be avoided under all circumstances, not only because of the obvious influence on one's judgment and decisions, but because the granting or denying such a request imposes a wrongful burden on the customer."

17. Financial Institution 1's Code of Ethics training slide deck (which BAIROS-PIRELLI certified that he viewed) gives several examples of appropriate and inappropriate gifts. For example, it states that a loan originator accepting a $25 coffee shop gift card is "NOT okay," but that branches may accept "a platter of cookies . . . for the New Year." The slide deck also reiterates that employees must not "borrow" from an individual or business customer of the bank.

***B. Check Casher 1's bounced check rate increases***

18. Check Casher 1 representatives frequently deposited checks at the Medford Branch. But many of Check Casher 1's checks did not clear (that is, they "bounced") because, among other reasons, the checks were altered, drew upon closed accounts, or drew upon accounts with insufficient funds. Based on my training and experience investigating financial crimes, when checks that one financial institution customer deposits repeatedly bounce, that indicates that those checks were likely fraudulent.

19. Although some number of bounced checks is common for a check cashing business, between April 2025 and April 2026, Check Casher 1's rate of bounced checks rose significantly. According to Financial Institution 1 records, in April 2025, the first month after BAIROS-PIRELLI became a supervisor, 15 percent of Check Casher 1's check deposits bounced. By March 2026, 61 percent of check deposits bounced, before rising to 78 percent in April 2026. Check Casher 1 initially covered Financial Institution 1's losses from the bounced checks, but it did not cover all of them. In total, between on or about February 24, 2026, and April 20, 2026, Check Casher 1 representatives deposited more than $28 million in checks that bounced (including some checks that bounced two or more times). Check Casher 1 could not

cover all the bounced checks, leading to a loss of more than $1.5 million for Financial Institution 1.

20. Between on or about February 24, 2026 and April 20, 2026, employees overrode the recommendations of Financial Institution 1's anti-fraud check verification software not to process or to hold checks that Check Casher 1's runners deposited for approximately 302 checks. During that time, BAIROS-PIRELLI supervised tellers at the Medford Branch, where he was Check Casher 1's primary banking point of contact. Those checks had a face value of approximately $8,412,468.18. Between March 2 and March 30, 2026, Financial Institution 1 representatives specifically identified 84 checks that Check Casher 1 deposited between March 2 and March 30, 2026, which BAIROS-PIRELLI accepted even though the software recommended denying or holding them before making funds available for withdrawal.

21. BAIROS-PIRELLI not only submitted those flagged checks for deposit, but BAIROS-PIRELLI also frequently made their funds immediately available for withdrawal by the very same runners who brought them to Financial Institution 1.

22. Financial Institution 1 representatives interviewed BAIROS-PIRELLI on May 22, 2026. I have reviewed their notes from their interview. During the interview with his employer, BAIROS-PIRELLI admitted that he had accepted checks even when alerts appeared, but he claimed that he had placed extended holds on those checks. Financial Institution 1 representatives investigated BAIROS-PIRELLI's claim that he had placed such holds, but they found no evidence to support the claim. Based on my review of Financial Institution 1's records, I have not seen evidence that BAIROS-PIRELLI placed holds on flagged checks.

23. On days that Check Casher 1 representatives deposited checks, they also withdrew cash from Check Casher 1's bank accounts. Even though Financial Institution 1 had

policies that sometimes required holding large checks to make sure they cleared, BAIROS-PIRELLI would often make them available the same day. For example, BAIROS-PIRELLI sent an email from his Financial Institution 1 email account dated November 7, 2025 with the subject line "CASH ORDERS // [Check Casher 1]" In that email, BAIROS-PIRELLI wrote to his colleagues at the Medford Branch with a list of reminders for them while he was away from work. In particular, BAIROS-PIRELLI stated that there should be "NO HOLDS" placed on deposits associated with Check Casher 1's account. BAIROS-PIRELLI also wrote that "I ALWAYS KEEP AN EYE ON [INDIVIDUAL 1's] RELATIONSHIP ACCOUNTS WITH US, PLEASE DO THE SAME" (capitalization in original).

***C. BAIROS-PIRELLI falsified records of Check Casher 1's transactions***

24. Up until on or about June 24, 2025, Check Casher 1 used a Brink's courier to take possession of cash from the Medford Branch and deliver it to Check Casher 1's storefront. Financial Institution 1 keeps a log of all Brink's transactions at the Medford Branch. According to that log Brink's last cash delivery from the Medford Branch to Check Casher 1 occurred on June 24, 2025. I have also reviewed surveillance footage from Check Casher 1's withdrawals from the Medford Branch, and the footage did not show any representatives from Brink's present during Check Casher 1's transactions that followed June 24, 2025. Nevertheless, Financial Institution 1's internal records and corresponding CTRs indicate that Brink's (not the runners or Individual 1) conducted Check Casher 1's withdrawals after June 24, 2025, and that BAIROS-PIRELLI processed the vast majority of those transactions.

25. BAIROS-PIRELLI also admitted to Financial Institution 1 investigators that he knew that Brink's was not taking Check Casher 1's post-June 24, 2025 cash withdrawals. BAIROS-PIRELLI further stated that he "didn't know" who else to select and "didn't think [it

was] an issue." Yet, in that same interview, BAIROS-PIRELLI acknowledged knowing that falsely reporting Brink's involvement violated Financial Institution 1's policies and that BAIROS-PIRELLI was supposed to add new transactors if the person accepting the cash did not hold the account. When Financial Institution 1 representatives asked BAIROS-PIRELLI why he did not add the runners to the internal recordkeeping system, BAIROS-PIRELLI replied, "I don't know." BAIROS-PIRELLI called selecting Brink's a "mistake." Additionally, BAIROS-PIRELLI asserted that Individual 1 told him to "pretend it's Brink's," but BAIROS-PIRELLI then contradicted himself by saying that Individual 1 did not know that he recorded Brink's as the transactor.

26. After June 24, 2025, Individual 1 withdrew cash from the Medford Branch either herself or using individuals associated with Check Casher 1 ("runners"), who regularly took possession of tens (and sometimes hundreds) of thousands of dollars in cash without using a secure vehicle. Those same runners also brought checks from Check Casher 1 for deposit.

27. Based on my training and experience investigating financial crimes, I know that the repeated use of an unsecure runner to take possession of enormous amounts of cash exposes the runner (and Check Casher 1) to the risk that the runner will be robbed. Accordingly, I believe that, had Financial Institution's BSA staff or examiners had known that Check Casher 1 was engaging in such a business practice, Financial Institution 1 would have investigated and reconsidered whether to continue its banking relationship with Check Casher 1 – and may have detected the fraudulent checks. I also believe that repeated misidentification of a party to a transaction by an experienced, supervisory employee, like BAIROS-PIRELLI, demonstrates that the employee intentionally, and not accidentally, misidentified the party.

### *D. BAIROS-PIRELLI accepted thousands of dollars from Individual 1 to keep Check Casher 1's account open at Financial Institution 1*

28. On June 17, 2026, I (along with other government personnel) interviewed Individual 1.[1] Among other things, Individual 1 stated that she first met BAIROS-PIRELLI in or about 2020 when conducting business at Financial Institution 1. At the time, Individual 1 did not formally own Check Casher 1, but she controlled it through a nominee business partner. Individual 1 described a relationship with BAIROS-PIRELLI that began professionally and friendly, but over time BAIROS-PIRELLI began to ask to borrow money. Individual 1 stated that Individual 1 agreed to do so but began to feel uneasy about the relationship with BAIROS-PIRELLI.

29. Individual 1 further stated that BAIROS-PIRELLI continued to ask for loans, despite never paying back the previous loans. According to Individual 1, in or about 2022, Individual 1 told BAIROS-PIRELLI that Individual 1 did not feel comfortable giving him any more money.[2] In response, BAIROS-PIRELLI told Individual 1 that he knew how much money Check Casher 1 and Individual 1's other businesses made because of Financial Institution 1's banking records, and that he had the ability to make things happen at Financial Institution 1. Individual 1 interpreted this as a veiled threat that BAIROS-PIRELLI could decide whether

---

[1] Individual 1's attorney participated in the interview, and Individual 1 executed a proffer agreement with the U.S. Attorney's Office. Individual 1 is a foreign national who was removed from the United States in or about 2002 for making a willful misrepresentation of a material fact, though Individual 1 is now a legal U.S. permanent resident. In or about 2017, Individual 1 was also accused in a state civil suit of stealing from a previous employer, a check casher. I nevertheless include statements from Individual 1 that I have corroborated and found reliable based on my own and other federal law enforcement agents' investigation of this case. I also include statements that I view as credible because Individual 1 provided them against Individual 1's interest.

[2] As I describe below, the text messages that I reviewed reflected that BAIROS-PIRELLI's requests for money began in 2023, not 2022.

Individual 1's personal and business banking relationships could continue at Financial Institution 1. Individual 1 feared losing Check Casher 1's banking relationship with Financial Institution 1 because there were not many financial institutions willing to maintain relationships with check-cashing businesses. BAIROS-PIRELLI demanded that Individual 1 provide him with $1,000 in an envelope every week, which Individual 1 did starting in or about 2022 and ending in 2026. Check Casher 1 produced text messages between Individual 1 and BAIROS-PIRELLI. Cell phone service provider records confirmed that the phone numbers shown in those messages (ending in 3719 and 7181) belonged to Individual 1 and BAIROS-PIRELLI, respectively. Specifically, records from T-Mobile showed that the subscriber for phone number ending in 3719 is BAIROS-PIRELLI's. Further records obtained through Apple showed that the same phone number is a verified phone number associated with BAIROS-PIRELLI. Additional records from T-Mobile showed that the subscriber for the phone number ending in 7181 is Individual 1. Nearly all the communications between Individual 1 and BAIROS-PIRELLI were in Portuguese, so a law enforcement officer fluent in Portuguese translated them.

30. Records from T-Mobile showed daily communication between BAIROS-PIRELLI and Individual 1 by frequent phone calls and text messages, which matched the frequency of the text messages produced by Individual 1.

31. On or about August 1, 2023, at approximately 10:21 a.m., BAIROS-PIRELLI texted Individual 1 that his uncle reminded BAIROS-PIRELLI that he owed the uncle $6,000. In response, Individual 1 promised to give BAIROS-PIRELLI thousands of dollars to help.

32. On or about February 16, 2026, at approximately 4:21 p.m., BAIROS-PIRELLI sent Individual 1 pictures of a new GMC Acadia Sport Utility Vehicle (SUV) and thanked Individual 1 for the payment. Records obtained from GM Financial show that, on or about

February 17, 2026, BAIROS-PIRELLI signed a sale contract to purchase a new 2026 GMC Acadia for a total price of $67,358. The GMC records also showed that BAIROS-PIRELLI used $5,000 as a down payment to purchase the vehicle.

33. Based on my training and experience investigating financial crimes, and knowledge of the investigation, I believe that Individual 1 provided BAIROS-PIRELLI with the $5,000 used for a down payment to purchase the vehicle as a bribe.

34. On or about February 24, 2026, at approximately 2:12 p.m., BAIROS-PIRELLI informed Individual 1 that he had received a white envelope with cash in it, and approximately an hour later Individual 1 told him to hold on to it.

35. Based on my training, experience investigating financial crimes, and knowledge of the investigation, I believe that Individual 1 meant that Individual 1 had left BAIROS-PIRELLI an envelope containing a cash bribe.

36. On or about March 2, 2026, at approximately 9:48 a.m., Individual 1 ordered $100.94 of food from Bagel Shop 1 to be delivered by Food Delivery Service 1 to the Medford Branch. Individual 1 wrote in the delivery notes, "Please give to [Individual 2] Or Luis inside the bank \nThank you!!!" Individual 2 was BAIROS-PIRELLI's supervisor. Food Delivery Service 1 records show that the order was delivered at or about 10:24 a.m.

37. On or about March 2, 2026, at approximately 3:46 p.m., Individual 1 texted BAIROS-PIRELLI stating that one of the runners was going to leave "1K" for him, to which BAIROS-PIRELLI responded with several heart emojis.

38. Based on my training, experience investigating financial crimes, and knowledge of the investigation, I believe that Individual 1 communicated that the runner had left

BAIROS-PIRELLI a $1,000 cash bribe. I believe that BAIROS-PIRELLI sent the “heart” emojis to thank Individual 1 for the cash.

39. On or about March 11, 2026, at approximately 12:11 p.m., BAIROS-PIRELLI texted Individual 1 that “the bracelet was too large,” but when Individual 2 saw it, she was delighted. BAIROS-PIRELLI then asked if he could give it to Individual 2, to which Individual 1 replied, “of course,” and Individual 1 “would buy another one for him.”

40. Based on my training, experience investigating financial crimes, and knowledge of the investigation, I believe that Individual 1 had bought BAIROS-PIRELLI a bracelet, but it did not fit him. Individual 1 agreed to allow BAIROS-PIRELLI to regift the bracelet to his supervisor (Individual 2) and to buy BAIROS-PIRELLI a new bracelet.

41. On or about March 13, 2026, at approximately 9:05 a.m., Individual 1 texted BAIROS-PIRELLI that someone would leave “1K” at the branch. At approximately 9:09 a.m., Financial Institution 1’s surveillance footage showed a runner in an office used by BAIROS-PIRELLI. A runner handed BAIROS-PIRELLI a stack of checks, which BAIROS-PIRELLI spread across his desk and then photographed with what appears to be an Apple iPhone.




42. After BAIROS-PIRELLI photographed the checks, a runner placed cash into a white envelope and put it on BAIROS-PIRELLI’s desk. BAIROS-PIRELLI then picked up the envelope.




43. Financial Institution 1 prohibited employees from using their personal phones at work. Taking pictures of checks with a personal phone also violated Financial Institution 1's customer data security policies.

44. Based on my training, experience investigating financial crimes and knowledge of the investigation, I believe that the envelope containing cash was a $1,000 bribe that a runner paid to BAIROS-PIRELLI on behalf of Individual 1.

45. On or about March 19, 2026, at approximately 9:08 a.m., Individual 1 texted BAIROS-PIRELLI that one of the runners was almost at the bank, and that Individual 1 told the runner "to take 1K and put it in an envelope to hand to" BAIROS-PIRELLI.

46. Based on my training, experience investigating financial crimes, and knowledge of the investigation, I believe that Individual 1 communicated that a runner was bringing BAIROS-PIRELLI a $1,000 cash bribe.




47. On or about March 26, 2026, at approximately 9:08 a.m., Financial Institution 1's surveillance footage showed BAIROS-PIRELLI receiving two envelopes from a runner. BAIROS-PIRELLI then retrieved checks from at least one of the envelopes, spread them across his desk, and took a picture of them with what appears to be an Apple iPhone.

48. Based on my training, experience investigating financial crimes, and knowledge of the investigation, I believe that BAIROS-PIRELLI was taking photos of potentially fraudulent checks that a runner presented for deposit on behalf of Individual 1.

49. On or about Friday, March 27, 2026, at approximately 10:02 a.m., Individual 1 texted BAIROS-PIRELLI begging him not to close Individual 1's accounts and offering to pay BAIROS-PIRELLI "whatever he wants."

50. On or about March 27, 2026, at approximately 11:51 a.m., Individual 1 texted BAIROS-PIRELLI that a runner was going to "leave an envelope with 3K."

51. On or about Monday, March 30, 2026, Financial Institution 1's surveillance footage showed a runner leaving a purple drawstring bag on BAIROS-PIRELLI's desk:




52. Based on my training, experience investigating financial crimes, and knowledge of the investigation, I believe that Individual 1 communicated that a runner was bringing BAIROS-PIRELLI a $3,000 cash bribe in exchange for BAIROS-PIRELLI's commitment not to close Individual 1's account at Financial Institution 1. The transaction then occurred, as shown in the above surveillance footage.

53. Around this time, officials at Financial Institution 1 became increasingly alarmed about the rate of bounced checks presented for deposit into Check Casher 1's account. On or about April 13, 2026, BSA Staff Member 1 emailed BAIROS-PIRELLI and Individual 2 with the subject line "Significant Increase in Check Returns." In the email, BSA Staff Member 1 wrote that the staff "have been discussing check returns for [Check Casher 1], and more recent the significant increase in check returns for March & April" and asked [BAIROS-PIRELLI and Individual 2] to "please reach out to [Check Casher 1] to determine why the increase recently and overall why so many returned checks."

54. The following day, April 14, 2026, at approximately 2:00 p.m., Individual 1 texted BAIROS-PIRELLI, "5K more for you to save me."

55. Based on my training, experience investigating financial crimes, and knowledge of the investigation, I believe that Individual 1 communicated that a runner was bringing BAIROS-PIRELLI a $5,000 cash bribe.

56. In total, between on or about December 5, 2025, and April 15, 2026, Individual 1 ordered approximately $2,167.20 in food to be delivered to BAIROS-PIRELLI and Individual 2 at the Medford Branch.

57. During the May 22, 2026 interview with Financial Institution 1 representatives, BAIROS-PIRELLI admitted that he would sometimes take possession of an envelope that a runner provided him, though BAIROS-PIRELLI claimed that those envelopes were for contractors that Individual 1 owed money to. BAIROS-PIRELLI further acknowledged accepting gifts such as homemade food and small gift cards from customers and asserted that the purple drawstring bag contained a mug that a runner brought back from a trip.

58. In summary, there is probable cause to believe that BAIROS-PIRELLI solicited and accepted at least $50,000 in cash, food, and other gifts, including jewelry, from others, in exchange for allowing Check Casher 1 to deposit millions of dollars in suspect checks. This number reflects the prices of gifts provided to BAIROS-PIRELLI and the instances in which Individual 1 informed BAIROS-PIRELLI through text messages that individuals would be coming to hand him envelopes full of cash. The text messages between BAIROS-PIRELLI and Individual 1 provide probable cause to believe that BAIROS-PIRELLI demanded those payments with a corrupt intent.

## CONCLUSION

59. Based on the information described above, there is probable cause to believe that on or about March 30, 2026, in Medford, Massachusetts, LUIS ANTONIO REGO

BAIROS-PIRELLI, an employee of Financial Institution 1, a Federal Reserve member bank with Federal Deposit Insurance Corporation-insured deposits, corruptly solicited and accepted a $3,000 payment from Individual 1 intending to be influenced and rewarded in connection with a transaction and business of Financial Institution 1, that is, keeping Check Casher 1's account open at Financial Institution 1.

William Burmeister DLC

William Burmeister
Special Agent
Office of Inspector General
Board of Governors of the Federal Reserve System
and the Consumer Financial Protection Bureau

Subscribed and sworn to by telephone in accordance with Federal Rule of Criminal Procedure 4.1 this 13th day of November 2026.

Hon. Donald L. Cabell
United States Magistrate Judge
District of Massachusetts

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS